IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Arthur Laudman, in his capacity as Personal Representative of the Estate of Jerome Laudman, deceased,<br><br>        Plaintiff,<br><br>v.<br><br>Anthony Padula, individually and/or in his official capacity as Warden for Lee Correctional Institution; Jonathan Goodman, individually and/or in his official capacity; Anthony Davis, individually and/or in his official capacity; Gertrude Jenkins, individually and/or in his official capacity; Bruce Oberman, individually and/or in his official capacity; Jake McFadden, individually and/or in his official capacity; Paget James, individually and/or in his official capacity; Herman Finklea, individually and/or in his official capacity; Roy T. Cooper, individually and/or in his official capacity; Derrick Anderson, individually and/or in his official capacity; and South Carolina Department of Corrections,<br><br>        Defendants. | Civil Action No. 3:12-2382-SB<br><br><br><br><br><br>**ORDER** |

This matter is before the Court upon the Plaintiff's[1] complaint asserting claims under

42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. §§

12131-12165; and South Carolina law. On November 6, 2012, Defendant Oberman filed

a motion to dismiss. The Plaintiff filed a response on December 11, 2012, and Defendant

---

[1] The Plaintiff, Arthur Laudman ("Arthur"), brings this suit in his capacity as personal representative of the estate of Jerome Laudman ("Jerome"). Arthur is Jerome's uncle.

Oberman filed a reply on December 28, 2012. The parties conducted limited discovery regarding the statute of limitations, and on July 15, 2013, the Defendants filed a motion for summary judgment. The Plaintiff filed a response on August 2, 2013, and the Defendants filed a reply on August 12, 2013. On August 23, 2013, United States Magistrate Judge Joseph R. McCrorey issued a report and recommendation ("R&R") in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a) (D.S.C.). The Defendants filed objections to the R&R on September 9, 2013, and the Plaintiff filed a response to the Defendants' objections on September 25, 2013.

In the R&R, the Magistrate Judge recommends that the Court grant Defendant Oberman's motion to dismiss as to claims asserted against him in his official capacity but deny the motion in all other respects. The Magistrate Judge also recommends that the Court grant the Defendants' motion for summary judgment as to the Plaintiff's ADA claim and the Plaintiff's section 1983 claims against Defendant South Carolina Department of Corrections ("SCDC") and the individual Defendants in their official capacities. The Magistrate Judge recommends that the Court deny the Defendants' motion for summary judgment in all other respects.

## STANDARDS OF REVIEW

### I.    The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making the final determination remains with the Court. Mathews v. Weber, 423 US. 261, 269 (1976). The Court reviews *de novo* those portions of the R&R to which specific objection is made, and

the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

## II.    Motion to Dismiss

When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true the facts alleged in the complaint and view them in a light most favorable to the Plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999).  The United States Supreme Court has stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.  Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

## III.    Summary Judgment

To grant a motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." Celotex, 477 U.S. at 327. Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. Anderson, 477 U.S. at 248.

## BACKGROUND

No one objected to the R&R's summary of the evidence, which the Magistrate Judge presented in the light most favorable to the Plaintiff. Therefore, the Court adopts this portion of the R&R and restates it as follows.

1.      Jerome suffered from a variety of mental health conditions, including bipolar disorder, paranoid schizophrenia, and mental retardation. He was placed in SCDC custody in April 1998. SCDC counselors classified him as suffering from serious mental illness and needing mental health treatment. (Amended Complaint, ECF No. 6, ¶ 11.)

2.      On June 20, 2005, the law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") filed a class action (the "Class Action") against SCDC (and others) in South Carolina state court, seeking declaratory and injunctive relief concerning alleged systemic deficiencies in SCDC's mental health program. (Daniel J. Westbrook's Aff., ECF No. 61-1, ¶ 2.)

3.      On January 11, 2006, the Class Action court entered a protective order limiting the disclosure of documents produced in discovery by SCDC that were marked confidential.  Pursuant to that order, "restricted portions of medical records of an inmate may be shown to that inmate only upon consent of all parties or by court order." (ECF No. 61-1, ¶ 4.)

4.      In 2007, SCDC transferred Jerome to Lee Correctional Institution ("LCI") in Bishopville, South Carolina. (Plaintiff's Opp. Mem., ECF No. 61 at 3.)  On December 7, 2007, SCDC placed Jerome on Crisis Intervention status because he was displaying severe mental health symptoms, including screaming, hallucinating, and appearing psychotic.  Crisis Intervention is designed to "provide intensive inpatient mental health treatment for 'legitimate mental health care disorders or problems' . . ." for up to seven days. (ECF No. 6, ¶ 17.)

5.      On January 11, 2008, Nelson Mullins served SCDC with a request for production, which included a request to produce the medical records of 88 mentally-ill inmates, including Jerome. (ECF No. 61-1, ¶ 6.)

6.      On February 7, 2008, SCDC transferred Jerome to the "Supermax" unit of LCI. During the cell extraction process from Crisis Intervention to Supermax, Defendant Davis gassed Jerome with chemical munitions and roughly threw him into a Supermax cell. Davis subsequently determined Jerome was placed in the wrong cell and roughly extracted him from the first cell and threw him (while handcuffed) into another cell. (ECF 6, ¶ 20.)

7.      Supermax is designed to punish and provide intensive supervision to inmates exhibiting assaultive behavior.  In February of 2008, LCI Supermax was reported to be extremely cold and without a working heating system in place.  Jerome was stripped of his

mattress, sheets, blanket, socks, shoes, underwear, and uniform.  (ECF 6, ¶ 19.)

8.      On February 11, 2008, Jerome became seriously ill and in need of immediate medical and mental health attention as a result of being exposed to the cold temperatures. Defendant Cooper noticed that Jerome appeared to be "stooped over like he was real weak or sick."  He considered notifying a unit captain or administrator about Jerome's condition, but his supervisor advised him against it.  Other inmates requested medical assistance for Jerome, but the requests were denied.  (ECF 6, ¶ 23.)

9.      Jerome remained in the Supermax cell without clothing, blankets, or other items to maintain warmth for the next seven days.  His mental health condition deteriorated dramatically.  Jerome refused meals, ingested fecal matter, smeared fecal matter on himself, and remained nude on the concrete floor.  (ECF No. 6, ¶ 24.)

10.     Inmates in adjoining cells made repeated requests to Defendants James and Finklea to help Jerome.  Both of these Defendants told the inmates the situation was "out of their hands."  On February 14, 2008, an inmate asked Defendant Jenkins to help Jerome.  She walked to Jerome's cell, observed him lying naked on the floor in an extremely sick condition, and subsequently told the inmate "don't worry about it, he'll be gone in a couple of days."  (ECF No. 6, ¶ 25.)

11.     By February 18, 2008, Jerome's mental and physical condition deteriorated. He experienced significant weight loss; numerous sores, cuts, and bruises; and mental incapacitation.  During the afternoon of February 18, 2008, Nurse Jeri Andrews received a call from Supermax that Jerome was down.  When she arrived at his cell, she observed that Jerome was on the floor face down in feces, urine, and vomit.  Nurse Andrews noted that there was a terrible stench and there were at least fifteen to twenty food trays

6

(containing molding/decaying food) between the cell doors. She noted that Jerome's breathing was shallow and he had movement in his arms. (ECF No. 6, ¶ 26.)

12.    Defendant Goodman instructed an inmate to sweep the trays out of the doorway to Jerome's cell to allow the nurse access. Nurse Andrews advised Defendants Goodman and Anderson that Jerome needed to be removed from the cell so she could perform a physical examination and assessment. She offered them gloves and lab coats, but they adamantly refused to enter Jerome's cell and touch Jerome. Jerome remained lying naked on the concrete floor in near freezing conditions. (ECF No. 6, ¶ 27.)

13.    Nurse Andrews asked other inmates to remove Jerome from his cell. Nurse Andrews examined Jerome and noticed he was extremely cold to the touch, "like ice all over his body." His blood pressure was 100/40 with a pulse of 50. SCDC encounter records indicated that Jerome was "unresponsive, with pupils fixed and dilated." (ECF No. 6, ¶¶ 28-30.)

14.    Nurse Andrews had Jerome transferred to the medical unit "where the dried vomit and feces [were] cleaned from his body and his vital signs were assessed." (ECF No. 6, ¶ 30.)

15.    At approximately 1:55 p.m., Nurse Andrews instructed medical to contact Emergency Medical Services and have Jerome transferred to Tuomey Hospital for examination and treatment. EMS personnel found Jerome to be cold and apneic when they arrived at LCI Supermax. Following Jerome's transport to Tuomey Hospital, Jerome's body core temperature was 80.6 degrees Fahrenheit. Physicians treated Jerome for hypothermia, but he went into cardiac arrest. CPR was initiated, but his condition had deteriorated, and he was pronounced dead at 6:49 p.m. on February 18, 2008. (ECF No.

6, ¶ 31.)

16.    Jerome was forty-four years old at the time of his death.  (ECF No. 6, ¶ 9.)

17.    After Jerome's death, SCDC Inspector General Investigator Lloyd Greer ("Greer") began an investigation into "alleged misconduct and improprieties" regarding Jerome's death.  (ECF No. 6, ¶ 33.)

18.    The South Carolina Law Enforcement Division ("SLED") also began an investigation into Jerome's death.  (ECF No. 61 at 7.)

19.    On February 18, 2008, an SCDC employee contacted the Plaintiff (Jerome's uncle) to inform him of Jerome's death.  The Plaintiff inquired as to how Jerome died.  The SCDC employee told the Plaintiff "there was some seizure activity, but they would find out more after the autopsy was performed."  (Pl.'s Dep., ECF No. 61-3 at 7-8.)  No one from SCDC called the Plaintiff to give him any further information about the cause of Jerome's death.  (ECF No. 61-3 at 8.)

20.    After Jerome's funeral, the funeral home provided the Plaintiff with a copy of the death certificate, which listed the cause of death as "cardiac arrhythmia and cardiomegaly."  It also listed the manner of death as "natural."  (Death Certificate, ECF No. 61-2.)  The Plaintiff did not know what the terms cardiac arrhythmia and cardiomegaly meant.  (ECF No. 61-3 at 9.)

21.    By June of 2008, Investigator Greer finished his investigation and prepared a report referred to as the "Greer Report."  The Plaintiff alleges that the Greer Report identified the key roles that the Defendants had in the period of time prior to Jerome's death, indicated the Defendants were aware that Jerome suffered from a serious medical condition and failed to provide Jerome with access to needed medical care, and showed

that Defendants knew Jerome was confined in his cell in near freezing conditions without clothing or bedding. Additionally, the Plaintiff claims the Greer Report discussed the alleged use of excessive force by Goodman during the cell extraction process. (See Greer Report, ECF No. 61-4.)

22.    In February of 2009, SLED completed a preliminary inquiry and investigation into Jerome's death. (See ECF No. 61 at 10.) In a press release dated February 20, 2009, SLED advised that it referred Jerome's death investigation to the United States Attorney for the District of South Carolina for review of possible civil rights violations. The press release did not name any of the correctional officials allegedly involved in the potential rights violations. (See SLED Press Release, ECF No. 61-5.)

23.    A local newspaper published an article about the SLED press release on or about February 20, 2009. At some time after the article was published, the Plaintiff received a copy of the newspaper article in the mail. (See Pl.'s Supp. Aff., ECF 61-7.) The Plaintiff read the article and within a few days went to the SLED office and talked with someone about it. (ECF 61-3 at 14.) The Plaintiff called someone else within SLED and another phone number was given to him. No one from SLED or the other department called him back. He states he made three to four phone calls to SLED or the other agency. (Id. at 14-17, 22.)

24.    Nelson Mullins did not receive the Greer Report until November 30, 2011. Because of the Amended Protective Order, the firm asserts it was prevented from disclosing the report to the Plaintiff at that time. (ECF No. 61-1, ¶¶ 16-17.)

25.    On April 23, 2012, after the restrictions of the Amended Protective Order were no longer in effect, Nelson Mullins attorney Daniel Westbrook ("Westbrook")

contacted the Plaintiff and informed him that Jerome's family may have a basis for recovering monetary damages. The Plaintiff contacted Nelson Mullins, and the law firm provided the Greer Report to him in May 2012. The Plaintiff claims that, after reading the report, he for the first time learned that the Defendants played a substantial role in causing Jerome unnecessary suffering and ultimately Jerome's death. (ECF No. 61-3 at 20-21.)

## DISCUSSION

In his amended complaint, the Plaintiff asserts claims against all of the Defendants pursuant to section 1983 for failure to provide medical care, cruel and unusual punishment, and excessive force. He also alleges claims against Defendant SCDC for a "pattern and practice" violation of civil rights pursuant to section 1983; for gross negligence (survival and wrongful death) under South Carolina law; and for a violation of the ADA.

In his motion to dismiss, Defendant Oberman contends that: (1) the applicable statute of limitations for a section 1983 claim has expired; (2) the matter should be dismissed as to him in his official capacity because the issue is duplicative; and (3) the action should be dismissed against him in his individual capacity because the Amended Complaint fails to allege any facts giving rise to a cause of action against him.

In their motion for summary judgment, the Defendants contend that: (1) the Plaintiff's section 1983 claims are barred by the applicable statute of limitations; (2) the Plaintiff's state law claims are barred by the applicable statute of limitations; (3) the Plaintiff fails to state a claim for violation of the ADA and such claims are barred by the applicable statute of limitations; and (4) Defendant SCDC and the individual Defendants in their official capacities are not "persons" within the meaning of section 1983 and are immune from suit pursuant to the Eleventh Amendment to the United States Constitution.

As an initial matter, the Plaintiff did not oppose the Defendants' motion for summary judgment as to his section 1983 claims asserted against the Defendants in their official capacities.  Accordingly, the Magistrate Judge recommended that the Court grant the Defendants immunity from the Plaintiffs's section 1983 claims for monetary damages against them in their official capacities. No party objected to this recommendation, and the Court therefore adopts the Magistrate Judge's recommendation.

Likewise, the Plaintiff did not oppose the Defendants' motion for summary judgment as to his ADA claim.  Therefore, the Magistrate Judge recommended that the Court grant the Defendants' motion as to the Plaintiff's ADA claim.  No party objected to this recommendation, and the Court therefore adopts the Magistrate Judge's recommendation.

With respect to Defendant Oberman, the Magistrate Judge rejected his argument that the Plaintiff's Amended Complaint fails to allege facts sufficient to give rise to a plausible claim against him in his individual capacity.  Thus, the Magistrate Judge recommended that the Court deny Oberman's motion to dismiss in this regard.  The Magistrate Judge recommended that the Court deny Oberman's motion in all other respects.  No party objected, and, finding no clear error, the Court adopts the Magistrate Judge's recommendation.

In their objections to the R&R, the Defendants assert that the Magistrate Judge erred: (1) in his analysis of the statute of limitations as it applies to the Plaintiff's state law claims; (2) in not recommending that the state law claims against Defendant SCDC be dismissed pursuant to the Eleventh Amendment; and (3) in his analysis of the statute of limitations as it applies to the Plaintiff's section 1983 claims.  The Court first will address the applicability of Eleventh Amendment immunity to the Plaintiff's state law claims against

11

Defendant SCDC and then will address the statute of limitations.

*Eleventh Amendment Immunity*

The Defendants contend that the Magistrate Judge erred in not finding that Eleventh Amendment immunity applies to the Plaintiff's state law claims against Defendant SCDC. The Court notes that the Magistrate Judge most likely did not address this argument in the R&R because the Defendants did not raise it in their motion.[2] Nevertheless, as Defendant SCDC raised this argument in its Answer, and as the Plaintiff does not claim that SCDC has otherwise waived this argument, the Court will consider it below.

In its response to the Defendants' objections, the Plaintiff contends that the Defendants misunderstand the law and that the South Carolina Tort Claims Act requires a plaintiff to sue the agency for whom an employee who acted negligently in the performance of his duties worked, rather than suing the employee directly. (ECF No. 66 at 2.) While the Plaintiff is correct that he must sue the agency–here, the SCDC–the Court agrees with the Defendants that the Plaintiff must do so in state court. See Harris v. Copeland, 2013 WL 4504764, *17 (D.S.C. Aug. 22, 2013) (dismissing the plaintiff's claims for assault, battery, and gross negligence against the SCDC as barred by Eleventh Amendment immunity, and noting that the plaintiff could have filed his claims in state court but "chose to proceed against SCDC in a forum lacking jurisdiction").

---

[2] The Defendants focused their Eleventh Amendment arguments on the Plaintiff's federal claims against SCDC and the individual Defendants in their official capacities and limited their argument regarding the Plaintiff's state law claims against SCDC to the statute of limitations issue. Aside from including one sentence stating that SCDC is entitled to the protections and immunities of the South Carolina Tort Claims Act (although in the context of the statute of limitations), the Defendants never actually argued that Eleventh Amendment immunity extends to the Plaintiff's state law claims against Defendant SCDC.

Sovereign immunity protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989). Although a State may waive sovereign immunity and consent to a suit in federal district court, South Carolina has not done so. Instead, section 15-78-10 of the South Carolina Code of Laws, i.e., the South Carolina Tort Claims Act, expressly provides that the State of South Carolina does not waive Eleventh Amendment immunity; that it consents to suit only in a court of the State of South carolina; and that it does not consent to suit in a federal court or in a court of another State. See S.C. Code Ann. § 15-78-20(e) ("Nothing in this chapter is construed as a waiver to the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States nor as consent to be sued in any state court beyond the boundaries of the State of South Carolina."). Therefore, the Plaintiff may pursue a tort claim against SCDC, which is an agency of the state and considered an arm of the state for purposes of the Eleventh Amendment, only in state court. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 121 (1984) (holding that a claim that state officials violated state law in carrying out their official duties is a claim against the State that is protected by the Eleventh Amendment, a principle that applies to "state-law claims brought into federal court under pendent jurisdiction"); DeCecco v. University of South Carolina, 918 F. Supp. 2d 471, 498 (D.S.C. 2013) (finding that even if the South Carolina Tort Claims Act allowed the plaintiff's gross negligence claim against USC to proceed in state court, "it would not allow it to proceed in federal court"); Lockhart v. South Carolina Dept. of Corrections, 2013 WL 3864052, *2 (D.S.C. July 24, 2013) ("Plaintiff's Complaint seeking monetary damages in this court pursuant to the S.C. Tort Claims Act is subject to summary

13

dismissal based on the Eleventh Amendment's grant of sovereign immunity to the State of South Carolina and its integral parts."); Swinton v. Allen, 2013 WL 3197077, *4 (D.S.C. June 21, 2013) (finding that an agency of the state would be entitled to Eleventh Amendment immunity in federal court and that a claim against the agency pursuant to the South Carolina Tort Claims Act must be brought in state court); King v. Ozmint, 2012 WL 4092689, *3 (D.S.C. Aug. 17, 2012) ("[T]he SCTA requries the agency or political subdivision to be substituted when an employee is individually names, and the agency is similarly entitled to Eleventh Amendment immunity in federal court."). Based on the foregoing, the Court dismisses the state law claims against Defendant SCDC.

### *Statute of Limitations*

Having dismissed the Plaintiff's state law claims against Defendant SCDC, the Court need not consider the issue of whether the statute of limitations bars the Plaintiff's state law claims against SCDC. Thus, the only remaining issue before the Court is whether the applicable statute of limitations bars the Plaintiff's federal claims against SCDC and the Defendants in their individual capacities.

In the R&R, the Magistrate Judge reviewed the facts in the light most favorable to the Plaintiff and determined that "genuine issues of material fact exist as to when [the Plaintiff] possessed sufficient facts about the harm done such that a reasonable inquiry would have revealed the cause of action." (ECF No. 63 at 13.) In their objections, the Defendants assert that the Magistrate Judge erred in analyzing the statute of limitations from the perspective of Arthur Laudman instead of from the perspective of Jerome, as he was the injured party. Accordingly, the Defendants assert that the statute of limitations applicable to the section 1983 claims began to run, at the latest, at the time of Jerome's

14

death on February 18, 2008.  In addition, the Defendants assert that even if the Magistrate

Judge was correct to focus on Arthur's perspective, the Magistrate Judge still erred by

applying a subjective rather than an objective standard.  In response, the Plaintiff contends

that "no case supports the proposition that the knowledge of the decedent in a civil rights

action that results in death triggers the beginning of the statute of limitations."  (ECF No.

66 at 3.)    The Plaintiff also contends that the Magistrate Judge applied the correct

approach in analyzing the statute of limitations.

As the Magistrate Judge noted, a court must look to the state statute of limitations

for personal injury torts when determining the statute of limitations for a section 1983 claim.

See Wallace v. Kato, 594 U.S. 384, 387 (2007); Wilson v. Garcia, 471 U.S. 261, 266-69

(1985).  Here, the parties agree that South Carolina's statute of limitations for personal

injury torts is generally three years.[3]  See S.C. Code Ann. § 15-3-530.  As previously

mentioned, the parties disagree about when the Plaintiff's claim accrued.

"[E]ven though the limitation is borrowed from state law, the question of when a

cause of action accrues under 42 U.S.C. § 1983 remains one of federal law."  Nasim v.

Waden, Maryland House of Correction, 64 F.3d 951, 955 (4th Cir. 1995) (citing Cox v.

Stanton, 529 F.2d 47, 50 (4th Cir. 1975) (emphasis in original)).  A cause of action accrues

under federal law "when the plaintiff possesses sufficient facts about the harm done to him

that reasonable inquiry will reveal his cause of action."  Id. (citing United States v. Kubrick,

444 U.S. 111, 122-24 (1979)).  In other words, "for purposes of a § 1983 claim, a cause

---

[3]  Federal courts are obligated not only to apply the analagous state statute of
limitations to federal constitutional claims brought under § 1983, but also to apply the
state's rules for tolling that statute of limitations.  Scoggins v. Douglas, 760 F.2d 535 (4th
Cir. 1985) (citing Bd. of Regents v. Tomanio, 446 U.S. 478, 484-86 (1980)).

of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice–e.g., by the knowledge of the fact of injury and who caused it–to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." Id.

Here, the Defendants assert that the Magistrate Judge erred by considering when the Plaintiff, Arthur Laudman, had knowledge of the claims and not when Jerome, the decedent, had knowledge of the claims.  As an initial matter, the Court notes that the Defendants did not raise this argument in their motion; instead, the Defendants argued about when *Arthur* was put on notice of the injury, asserting that the claim accrued on February 18, 2008, when Arthur was informed of the death, or at the very latest, when Arthur later learned that SLED was investigating Jerome's death.[4] After review, and in light of the particular and highly troubling facts of this case, the Court finds no error in the Magistrate Judge's analysis of the statute of limitations from the perspective of Arthur Laudman, and the Court overrules this objection. See also Estate of Knight ex rel Knight v. Hoggard, 182 F.3d 908, *4 (4th Cir. 1999) (finding that the statute of limitations for a section 1983 claim accrued when *the estate* had sufficient knowledge that a reasonable inquiry would have revealed its potential cause of action) (unpublished table decision).

The Defendants next object that the Magistrate Judge erred by applying a subjective rather than an objective approach when considering the statute of limitations.  The Defendants state: "under an objective analysis, a reasonable person would have known

---

[4] In addition, although not briefed by the parties, the Court believes that even if the Defendants had raised this argument, there would be a grave issue as to whether the decedent, who suffered from serious mental illness since at least the time he was placed into SCDC custody in April of 1998, even had the mental capacity to comprehend the alleged violations of his constitutional rights.

16

that a cause of action might exist when [he] found out that Jerome had died, that the death was purportedly caused by a health condition that had previously been controlled by medication, and that the investigation into that death was being turned over to the U.S. Attorney's Office for possible 'civil rights violations.'" (ECF No. 64 at 9.)

As the Magistrate Judge noted, however, when considered in the light most favorable to the Plaintiff, the facts are not as straightforward as the Defendants suggest. First, when Arthur learned that Jerome had died, he was purportedly told by someone at SCDC that "there was some seizure activity, but they would find out more after the autopsy was performed." (ECF No. 61-3 at 7-8.) The Defendants argue that Arthur should have known of a possible cause of action from this information alone because Jerome was only forty years old; Jerome's seizure disorder had not appeared to be life threatening; and there may have been some question as to whether Jerome was receiving his medication. According to the Plaintiff, however, it was reasonable for him to believe the SCDC employee and there was no reason for him to suspect a possible cause of action because Jerome did have a history of seizures; people in their forties do die from seizures; and three of Jerome's four siblings (including his twin brother) predeceased him by three to ten years due to a variety of ailments.

The Defendants next contend that the Plaintiff should have known about a possible claim two weeks after Jerome's death when he received a copy of the death certificate, which provided the cause of death as cardiac arrythmia and cardiomegaly. However, as the Plaintiff points out, the information on the death certificate did not necessarily conflict with the information provided by SCDC because Arthur had been told they would learn more after the autopsy. Moreover, the death certificate noted a "natural" manner of death,

giving the Plaintiff no reason to question what he had been told.

The Defendants also contend that the Plaintiff's claims accrued when he received a mailing at some point in 2008 that contained a newspaper clipping stating that SLED was investigating Jerome's death or, at the very latest, after the publication of a press release by SLED on February 20, 2009. The Plaintiff asserts in his supplemental affidavit that he now believes it is more likely that he received the newspaper clipping after the SLED press release; moreover, neither party has produced any newspaper clipping from 2008. In any event, the Plaintiff contends that once he learned of the SLED press release, he drove to a SLED office to obtain information and made multiple calls to SLED, all to no avail.

The Defendants claim that the Plaintiff was put on notice of his claims in April of 2009, when Nelson Mullins received part of Jerome's medical records as part of the Class Action discovery. However, as the Plaintiffs note, these documents were confidential and were subject to a protective order entered in January 2006, precluding their disclosure to the Plaintiff.[5] Moreover, Nelson Mullins was not representing Jerome when he died, and

---

[5] The facts surrounding Nelson Mullins' attempt to discover documents in the Class Action is troubling, to say the least. On July 21, 2008, Nelson Mullins served a request for production in the Class Action, asking for "all documents related to investigations by the Inspector General/Division of Investigations since January 1, 2005 in which a mentally ill inmate was an alleged victim at Lee, Lieber, or Perry." In September, Nelson Mullins filed a motion to compel regarding this request for production. In response, SCDC produced a list of 93 inmate files, but the list did not include Jerome. Nelson Mullins asserts that it did not learn of the SLED press release until March 5, 2010, when a paralegal discovered it online. On August 3, 2010, Nelson Mullins served SCDC with another request for production including a request to produce documents related to the deaths of mentally ill inmates in segregation. No reports or related documents were produced. On November 30, 2011, SCDC made available all Inspector General Investigative files that SCDC claimed were responsive to the request for production. None of the documents mentioned Jerome. Nelson Mullins then specifically requested documents about Jerome, and SCDC produced the Greer Report to Nelson Mullins. On April 23, 2012, after the restrictions of the Amended Protective Order were no longer in effect, an attorney for Nelson Mullins

the knowledge of Nelson Mullins is not imputable to the Plaintiff under the circumstances.

After review, the Court agrees with the Magistrate Judge that genuine issues of material fact exist about when the Plaintiff possessed sufficient facts about the harm done that reasonable inquiry would reveal his cause of action. Furthermore, the Court agrees with the Magistrate Judge that these genuine issues of material fact must be resolved by the trier of fact. Brown v. Am. Broadcasting Co., Inc., 704 F.2d 1296, 1304 (4th Cir. 1983) ("[T]he issue of when plaintiff knew, or reasonably should have known of the existence of her cause of action, is a question to be resolved by a jury."). Accordingly, the Court adopts this portion of the R&R and denies the Defendants' motion for summary judgment in this regard.[6]

## CONCLUSION

For the reasons set forth herein, the Court adopts the R&R (ECF No. 63) to the extent it is consistent with this order. Specifically, the Court grants Defendant Oberman's motion to dismiss (ECF No. 23) as to claims against him in his official capacity but denies the motion in all other respects. The Court grants the Defendants' motion for summary judgment (ECF No. 57) as to (1) the Plaintiff's section 1983 claims for monetary damages against Defendant SCDC and the Defendants in their individual capacities; (2) the Plaintiff's ADA claim; and (3) the Plaintiff's state law claims against SCDC. The Court

---

contacted the Plaintiff, and the law firm provided the Greer Report to him in May 2012.

[6] Having found that genuine issues of material fact exist as to when the Plaintiff's federal claims accrued, the Court declines to consider at this time the Plaintiff's arguments that he is entitled to equitable tolling and/or equitable estoppel. The Court may consider these arguments at a later date depending on the resolution of the genuine issues of material fact.

denies the Defendants' motion for summary judgment (ECF No. 57) in all other respects.

**AND IT IS SO ORDERED.**

Sol Blatt, Jr.
Senior United States District Judge

September **30**, 2013
Charleston, South Carolina